# In the United States Court of Federal Claims

No. 26-861

Filed: November 17, 2026*

| | |
|---|---|
| MINBURN TECHNOLOGY GROUP LLC,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>DELL FEDERAL SYSTEMS L.P.,<br><br>Defendant-Intervenor | ) |

*Alexander B. Ginsberg*, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, D.C., for plaintiff. With him on the briefs were *Robert C. Starling* and *Noah B. Curtiss*.

*Tayna B. Koenig*, Senior Trial Counsel, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for defendant. With her on the briefs were *Ana F. Smith*, Department of the Navy, Naval Information Warfare Center Pacific, and *J. Eric Anderson*, Associate Counsel Office of Intellectual Property, 36000, Naval Information Warfare Center Pacific.

*Craig Alan Holman*, Arnold & Porter Kaye Scholer LLP, Washington D.C., for defendant-intervenor. With him on the briefs were *Thomas A. Pettit*, *Roee Talmor*, *Adrienne Jackson*, and *Kristina Lorch.*

## OPINION AND ORDER

***SMITH*, Senior Judge**

In this post-award bid protest, the Court considers whether the government's failure to disclose a policy mandating exclusive use of a contract vehicle undermined competition. Plaintiff Minburn Technology Group LLC ("Minburn") challenges the United States Navy's ("the Navy") award of a blanket purchase agreement ("BPA") issued under the Federal Supply Schedule

* An unredacted version of this Opinion was issued under seal on September 25, 2026. *See* ECF No. 62. The Court provided the parties with the opportunity to submit proposed redactions. The Court accepts all proposed redactions.

Program ("FSS") to Intervenor Dell Federal Systems L.P. ("Dell Federal"). That Enterprise Services Agreement ("ESA") concerns the procurement of Microsoft products and services for the Navy and the United States Department of War ("DoW") at large.[1] Minburn alleges that the Navy did not disclose its actual requirement that DoW would require mandatory, exclusive use of the ESA moving forward. Along those lines, Minburn also claims that the Navy's policy constitutes a cardinal change which drastically changed the nature of competition. Minburn further argues that the government failed to complete an unbalanced pricing analysis when Dell Federal proposed an anomalous discount to a single line item in its proposal. In opposition, the Navy and Dell Federal contend that the solicitation contemplates exclusive use and that an unbalanced pricing analysis was unnecessary due to changes in the Federal Acquisition Regulations ("FAR").

Before the Court are the parties' cross-motions for judgment on the administrative record. *See* Pl.'s Am. Mot. for J. on the Administrative R., ECF No. 42; Def.'s Cross-Mot. for J. on the Administrative R., ECF No. 46; Intervenor's Cross-Mot. for J. on the Administrative R., ECF No. 48. For the following reasons, the Court **GRANTS** Minburn's motion, ECF No. 42, and **DENIES** the Navy and Dell Federal's motions, ECF Nos. 46, 48.

## I. BACKGROUND

### A. The Enterprise Software Initiative Seeks to Consolidate and Streamline DoW's Commercial Software Acquisition Purchases.

In 1998, DoW established the Enterprise Software Initiative ("ESI") to streamline its acquisition of commercial software. *See* Def.'s Ex. 1, ECF No. 46-2 at 10. Since its inception, DoW's ESI has promoted ESA agreements to procure information technology ("IT") software products and services across its enterprise.

Starting in 2010, the Navy began procuring Microsoft products and services through Enterprise Software Licensing Agreements. Admin. R. ("AR") Tab 1 at 2. From 2012 to 2018, the agency awarded several agreements to resellers of Microsoft products. *Id.* Those resellers also held Multiple Award Schedule contracts ("MAS") issued by the General Services Administration ("GSA"). *Id.*[2] The agreements consolidated Microsoft procurements across the Navy, "providing improved visibility, control, and pricing compared to the previous decentralized approach." *Id.* The Navy continued its efforts to implement and manage IT agreements across DoW through "consolidating, centralizing, and streamlining IT acquisition." *Id.* As a result, the Navy awarded multiple vendors, including Minburn and Dell, 10-year ESI BPAs in connection with their GSA MAS contracts in 2018. *Id.*

That same year, DoW designated the Navy as Executive Agent for Core Enterprise Technology Agreements ("CETA") for the entire department. AR Tab 37 at 2192 (citing DoD

---

[1] For purposes of this Opinion, the United States Department of Defense ("DoD") is synonymous with DoW and will be used interchangeably.

[2] "The Federal Supply Schedule program is also known as the GSA Schedules Program or the Multiple Award Schedule Program." *See* 48 C.F.R. § 8.402(a). GSA manages and directs the FSS program to simplify "obtaining commercial supplies and commercial services at prices associated with volume buying." *Id.*

Directive 8470.01E). CETAs aim "to consolidate and streamline software acquisition across the entire DoW enterprise" through favorable terms and pricing. AR Tab 29 at 1635. Agreements designated as a CETA also ensure efficient supplier management and strategic technology alignment. AR Tab 4 at 22. Regulations provide that an ESI agreement with a CETA designation becomes "mandatory for use when a procurement requirement is within the scope of the CETA contract." AR Tab 37 at 2192.

### B. Minburn's DEOS BPA and the Predecessor to ESA II Cover DoW's Enterprise Needs for Microsoft Products and Services.

DoW "requires a robust and adaptable suite of office productivity, collaboration, security and compliance products" across its diverse environments. AR Tab 1 at 1. Evaluations of other vendors determined that Microsoft provides superior functionality and adaptable solutions to satisfy DoW's requirements. *Id.* at 3. Thus, "Microsoft products are foundational to the DoD's IT infrastructure" by "enabling secure mission execution, maintaining network operability, mitigating vulnerabilities, and driving cost efficiencies." AR Tab 1 at 3, Tab 3 at 10. Microsoft conducts business through resellers but only utilizes seven License Solutions Partners ("LSPs") to enter into agreements with the government. AR Tab 3 at 15, 17. LSPs, which include Minburn and Dell Federal, are partners authorized by Microsoft to engage in enterprise licensing. AR Tab 4 at 32.

In 2020, the Navy awarded Minburn with the Defense Enterprise Office Solution ("DEOS") BPA No. 47GTCA21A0003. *See generally* AR Tab 40. Under DEOS, Minburn resells cloud-based Microsoft products and services. *See id.* Those products and services would aid classified and non-classified operations in the United States and abroad. *Id.* at 2228. Offerings classified as "Secret" are designated "Impact Level 6" ("IL6") and products that qualify as "Top Secret" are denoted as "Impact Level 7" ("IL7"). *Id.* at 2294. Minburn processes all orders of IL6 and IL7 products and services which accounted for [redacted] percent of its gross revenue in 2025. *See* Am. Dec. of [redacted], ECF No. ECF No. 19-1 at ¶¶ 13–14.[3] To carry out DEOS, Minburn also partnered with General Dynamics Information Technology Inc. and Dell Marketing L.P. under a Contractor Team Arrangement. AR Tab 40 at 2226. DEOS contemplated an initial 10-year ordering period through 2030. *Id.* at 2228. The Navy further described DEOS as "a brand agnostic competition where Microsoft was the chosen technology." AR Tab 1 at 2–3.

At the same time, DoW awarded Dell Marketing with DoD Enterprise Services Agreement I ("ESA I") in June 2021. *See* AR Tab 4 at 24, Tab 36f at 2165. The Navy would begin using this single-award BPA "with other Services joining as their Enterprise Agreements [] naturally expire." AR Tab 36b at 2105. Dell Federal joined its corporate affiliate as a teaming partner for the five-year BPA which expired on May 31, 2026. AR Tab 36f at 2165. While initially valued at $2.5 billion, ESA I ballooned to accommodate $4.5 billion due to high demand for Microsoft licensing. AR Tab 1 at 2. DoW noted that ESA I "replaced earlier BPAs and is now the acquisition vehicle used for Microsoft licensing across the DoW." AR Tab 3 at 10.

---

[3] Minburn attached this declaration to its motion for a temporary restraining order and preliminary injunction, ECF No. 19. The Court adopts [redacted] testimony for background purposes and to this Court's record to address the non-merits factors for injunctive relief. *See AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 366–67 (2009).

In August 2021, the Navy issued a memorandum stating that it would designate DEOS and ESA I as CETAs. AR Tab 37 at 2192. "Once finalized, these purchasing vehicles will be mandatory for all DOD components and agencies and will use decentralized component-level funding." *Id.* The 2021 memorandum directed DoW components to use DEOS for cloud-based licenses and ESA I for on-premises licenses. *Id.*[4] Components were ordered to transition "at the earliest convenience or as existing contracts expire." *Id.* Any agency opting out of either agreement would require "a request and justification for that decision." *Id.*

But in 2025, the DoW prepared another memorandum stating its "strategy to streamline software acquisition and optimize software management, resulting in significant cost savings and improved operational efficiency." AR Tab 38 at 2193. DoW's plan emphasized "accelerating [CETAs and ESAs], developing a software licensing governance strategy, and establishing DoD-wide software agreement policies." *Id.* at 2196. That led to another internal memorandum that was circulated in December 2025 in anticipation of what became ESA II. AR Tab 39 at 2225. In its memo, DoW stated that all "Components are hereby directed to align their current and future Microsoft agreements to the greatest extent practicable" starting in June 2026. *Id.* The memorandum also provided that Components "are expected to procure Microsoft products exclusively through the ESI-provided catalog." *Id.*

### C. The Navy Issues the Solicitation and Awards Dell Federal ESA II.

In May 2026, the Navy issued Solicitation No. N6600126Q00510002 and amended it twice. *See generally* AR Tabs 10, 11. DoW sought "a new, comprehensive" BPA against GSA MAS for Microsoft products and services. AR Tab 11 at 573. ESA II would "build upon the successes and lessons learned from" ESA I, "which demonstrated substantial cost avoidance and improved license management." AR Tab 3 at 24. The follow-along to ESA I would continue to offer licensing models and product capabilities that meet the evolving operation, cybersecurity, and mission requirement of both [Department of the Navy] stakeholders and the greater DOW." AR Tab 3 at 11.[5]

ESA II would feature five annual ordering periods beginning in June 2026 and ending on April 30, 2031. AR Tab 11 at 549. The Navy estimated ESA II's maximum value at $9.668 billion. *Id.* ESA II was "contingent upon the Contractor maintaining products/services of the BPA on the applicable GSA Schedule." *Id.* Accordingly, the Navy issued the Solicitation to pre-existing GSA MAS contract holders, which again included Minburn and Dell Federal. The Solicitation also included Attachment 2 which listed all Microsoft products and services offered under ESA II. *See generally* AR Tab 11b. Within Attachment 2, each Contract Line Item Number ("CLIN") contained a corresponding Microsoft product and Stock Keeping Unit ("SKU") code. *Id.* DoW set the deadline for proposals for May 12, 2026.

---

[4] DoW announced an "interim exception" to the 2021 memorandum to allow DoW components to purchase cloud-based licenses from either DEOS or ESA I. AR Tab 34 at 1948.

[5] Like ESA I, customers under ESA II would include the Navy, the Department of the Air Force, the Defense Information Systems Agency, and the Fourth Estate, a collection of "defense agencies and field activities that are organizationally separate from the military services." AR Tab 3 at 11.

Elsewhere, the Solicitation required that all "products offered must be on your GSA MAS" and that Resellers must complete Attachment 2. AR Tab 11 at 573. To evidence product inclusion on their GSA MAS, Resellers would submit a copy of their GSA Approved Price List." *Id.* Offerors would further certify that "all products listed in Attachment 2 are currently included on" their FSS contract. *Id.* at 570; *see also id.* at 574 (reiterating these requirements as eligibility criterion for award). Solicitation Attachment 2 contained fields for offerors to insert their pricing and the Navy provided estimated quantities for each product and service. *See* AR Tab 11b. Aside from a contractor's proposed prices, "Ordering Officers will still be able to negotiate for spot discounts at the call or order level." AR Tab 4 at 38. The Solicitation mandated that offerors provide discounts at least two percent below their GSA FSS contract. AR Tab 11 at 573.

Other eligibility criteria required a "Letter of Authorization" signed by a Microsoft representative and Top-Secret Level Facility Clearance. *Id.* at 574. As for ESA II's scope, the BPA contemplated that licenses would encompass all Microsoft software used on all DoD networks. *Id.* at 549. In addition, government entities "may transition into the Agreement at any time following the expiration of their own Agreement." *Id.* at 549. The Solicitation also noted that if customers under DEOS "at any time during the duration of this agreement, decide to transition its Enterprise Products to the DoW ESA II Agreement, then Microsoft and the Contractor shall ensure the transition is made with no penalty to the Government." *Id.* at 560. To realize ESI's goals, the Solicitation encouraged contractors to enforce "the policy that [ESA II] is mandatory for consideration in accordance with DFARS Subpart 208.74." *Id.* The Navy would evaluate all eligible offerors "based on the total overall price (of all the products and services found in Attachment 2 at the estimated quantities stated)." Thus, "the responsive reseller whose quote conforms to all RFQ requirements, meets all eligibility criteria . . . and offers the lowest" price would receive ESA II. *Id.* at 577.

The Navy received offers from Minburn, Dell Federal, and Carahsoft Technology Corp. AR Tab 28 at 1629–30. Between each proposal, Dell Federal offered the lowest price. In comparison, Dell Federal offered a price of $11,406,845,996.85, or 4.45 percent lower than Minburn's offer at $11,914,188,605.35. *See* AR Tab 29 at 1643. In a pricing analysis, the Navy not only compared prices between Minburn and Dell Federal but also compared prices to historical prices paid under DEOS. *Id.* at 1644. The price analysis concluded that "ESA II offers substantial cost savings for most of the products analyzed, resulting in a total cost avoidance of approximately [redacted] over five years." *Id.* Navy evaluators determined that "most products cost less under [DoW] ESA II, with discounts from DEOS pricing reaching [redacted] for some items." *Id.* Discounts on [redacted] also make ESA II more cost-effective and "underscores a strategic financial advantage in leveraging" ESA II over DEOS. *Id.* The Navy further compared each offeror's proposed BPA unit prices to their GSA prices as well. *Id.* at 1645.

As part of its bid, Dell Federal submitted its FSS Authorized Price List. *See* AR Tab 15f. Notably, its Cloud-Based Services and Third-Party Product price lists did not list any items. *See id.* at 705, 712. Instead, Dell Federal would provide those lists "upon request." *Id.* Dell Federal also attached a spreadsheet that contained 6,150 Microsoft products from its GSA Schedule and an associated "mapping" tool. AR Tabs 15g, 15h. The company further certified that all products appearing in Solicitation Attachment 2 are on Dell Federal's GSA MAS contract. AR Tab 11 at 753.

On May 14, 2026, or two days after the submission of offers, the Navy awarded ESA II to Dell Federal. AR Tab 30 at 1648. Thereafter, the Navy published an ESA II BPA Ordering Guide. *See generally* AR Tab 34. The Ordering Guide contains language that states DoW "has officially transitioned to a centralized acquisition approach. All DoW Components are now required to procure Microsoft products and services exclusively through the ESI-provided catalog . . ." *Id.* at 1948. DoW Components then began informing Minburn that they received instructions to discontinue their orders on DEOS and to order from ESA II exclusively. In an email exchange with one customer, Minburn then learned about DoW's December 2025 Memorandum that directed DoW's policy change. Pl.'s Ex. J, ECF No. 1-1 at 1–2.

## II. PROCEDURAL HISTORY

On June 11, 2026, or 10 days after DoW published its Ordering Guide, Minburn filed suit in this Court. *See* Compl., ECF No. 1. A day later, Dell Federal moved to intervene which the Court granted. *See* Order Granting Mot. to Intervene, ECF No. 16. Minburn then sought a temporary restraining order and preliminary injunction to enjoin defendant from placing orders under ESA II during this protest. *See* Pl.'s Mot. for TRO and Prelim. Inj., ECF No. 19. During a June 16, 2026, status conference, the parties represented "that they had reached an agreement in principle for a partial stay which would moot [Minburn's] motion." Scheduling Order, ECF No. 25. On June 22, 2026, the parties finalized their voluntary stay, in which the Navy agreed that it would not permit any classified orders under ESA II. Joint Status Report, ECF No. 26 at 1–2.[6] Defendant requested a decision from this Court by September 24, 2026 "because several additional classified orders may require renewal at the end of" that month. *Id.* at 2. In addition, the parties proposed a schedule of proceedings to resolve this matter on the administrative record which the Court adopted. *See id.* at 2–3; Scheduling Order, ECF No. 28.

Under that schedule, defendant shared the administrative record on July 8, 2026. *See* Notice of File Sharing, ECF No. 30. Later that month, Minburn filed its first amended complaint and its motion for judgment on the administrative record. First Am. Compl., ECF No. 31; Pl.'s Mot. for J. on the Administrative R., ECF No. 32. The same day, Minburn also moved to supplement the administrative record and for the Court to take judicial notice. Pl.'s Mot. to Supp. the Administrative R. and for Judicial Notice, ECF No. 33. There, Minburn requested that the Court order defendant to produce Standard Form Modifications of Dell Federal's GSA MAS contract that "reflect[ed] the addition of the Microsoft products specified in" Attachment 2 of the Solicitation." *Id.* at 2. Minburn also requested that the Court take judicial notice of the fact that Dell Federal's Price List on GSAAdvantage.com featured "only 11 of the hundreds of items listed in Solicitation Attachment 2." *Id.* Under an expedited briefing schedule, the Navy and Dell Federal filed responsive briefing to Minburn's evidentiary motion. *See* Def.'s Resp. to Mot. to Supp. the Administrative R., ECF No. 43; Intervenor's Resp. to Mot. to Supp. the Administrative R., ECF No. 44. In its response brief, Dell Federal also moved to dismiss Counts II and III of Minburn's complaint for failure to state a claim. *See* ECF No. 44 at 9–14. The Court also adjusted the merits briefing schedule to accommodate Minburn's motion. *See* Scheduling Order, ECF No. 37. In a separate opinion, the Court granted-in-part and denied-in-part Minburn's motion and

---

[6] At the same time, the Navy and other DoW components could still place orders for non-classified products and services under ESA II. ECF No. 26 at 2.

denied Dell Federal's motion to dismiss. *See Minburn Tech. Grp. LLC v. United States*, No. 26-861, 2026 WL 2564252 (Fed. Cl. Aug. 17, 2026).

In early August 2026, Minburn sought this Court's leave to file a second amended complaint and amended motion for judgment on the administrative record. Pl.'s Mot. for Leave to File Am. Docs., ECF No. 38. The Court granted Minburn's request, which filed its amended papers thereafter. *See* Second Am. Compl., ECF No. 41; Pl.'s Am. Mot. for J. on the Administrative R., ECF No. 42.[7] The Navy and Dell Federal filed their responses and cross-motions for judgment on the administrative record on August 17, 2026.[8] Def.'s Cross-Mot. for J. on the Administrative R., ECF No. 46; Intervenor's Cross-Mot. for J. on the Administrative R., ECF No. 48.[9] Because the Navy could not produce Dell Federal's Standard Form Modifications by Minburn's next deadline, Minburn moved for a four-day enlargement of time which the Court granted. *See* Order Granting Mot. for Enlargement of Time, ECF No. 50. On August 27, 2026, defendant supplemented the administrative record. *See* Supp. to the AR, ECF No. 51. In early September, Minburn submitted its response and reply brief in support of its motion. Pl.'s Resp. & Reply Br., ECF No. 54. In its latest submission, Minburn withdrew Counts II and III to its complaint due to insufficient evidence. *Id.* at 26.

Briefing concluded when defendant and Dell Federal filed their reply briefs. *See* Def.'s Reply Br., ECF No. 55; Intervenors Reply Br., ECF No. 56. The Court then held oral argument on September 16, 2026, for the parties to elaborate on their positions asserted in their briefs. *See* Oral Arg. Tr., ECF No. 59.

## III. LEGAL STANDARDS

### A. Scope of Review Under Bid Protest Actions.

The Tucker Act confers jurisdiction on this Court "to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with [a] procurement . . . " 28 U.S.C. § 1491(b)(1). Interested parties are "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *CS 321 East 2nd Investors, LLC v. United States*, 178 Fed. Cl. 471, 483 (2025) (citing *Percipient.AI v. United States*, 153 F.4th 1226, 1235 (Fed. Cir. 2025)). This Court may award "any relief that [it] considers proper, including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2).

---

[7] All subsequent references to Minburn's briefing will come from its amended motion for judgment on the administrative record, ECF No. 42.

[8] The Navy and Dell Federal's cross-motions were originally due on August 14, 2026. *See* ECF No. 37. However, the parties agreed to a three-day enlargement of time for their briefing due to Minburn's motion for leave to file its amended documents. *See* ECF No. 38 at 1. The Court granted this three-day enlargement in its order granting Minburn's motion. *See* Order Granting Mot. for Leave to File, ECF No. 39.

[9] Dell Federal also attached a Memorandum of Law to support its motion. *See* Intervenor's Mem. of L. in Support of Cross-Mot. for J. on the Administrative R., ECF No. 48-1. All subsequent references to Dell Federal's arguments and positions will come from its Memorandum of Law.

Bid protests are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4). Under the APA, a court will set aside a federal agency's decision that is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1329 (Fed. Cir. 2004). Agency action is arbitrary and capricious when "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004). Such conduct lacks a rational basis when an agency failed to provide a "coherent and reasonable explanation of its exercise of discretion." *Id.* When challenging an award on the second ground, a plaintiff must show "a clear and prejudicial violation of applicable statutes or regulations." *Id.* Examples of arbitrary and capricious conduct include when a federal agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Courts must also find that the challenged agency action was prejudicial to the contractor to set aside agency action. *Bannum*, 404 F.3d at 1351. "The second step is always required before setting aside a bid award, regardless of whether the error identified at the first step was arbitrary and capricious action or, instead, a violation of law." *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 997 (Fed. Cir. 2021). A protester suffers prejudice upon a showing "that there was a substantial chance it would have received the contract award but for that error." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (citation omitted).

This Court will "interfere with the government procurement process only in extremely limited circumstances." *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1981). In application, the "arbitrary and capricious standard . . . is highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000); *see Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (requiring more than *de minimis* errors to obtain relief). Disappointed bidders bear "a heavy burden of showing that the award decision had no rational basis." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). If there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion. . . ." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). In sum, a court will not substitute its judgment for that of the agency. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).

**B. Motion for Judgment on the Administrative Record.**

Under Rule 52.1 of the Court of Federal Claims ("RCFC"), "a motion for judgment on the administrative record examines whether the administrative body, given all the disputed and undisputed facts appearing in the record, acted in a manner that complied with the legal standards

governing the decision under review." *Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013). Courts are required "to make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum*, 404 F.3d at 1356. Unlike a motion for summary judgment, genuine issues of material fact do not preclude the Court from entering judgment. *Id.* at 1355–56; *see id.* at 1356 (noting that unlike a motion under RCFC 56, "proceeding under RCFC [52.1] merely restricts the evidence to the agency record. . . ."). Thus, courts must determine whether a party satisfied its burden of proof based on the record. *Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed Cir. 2018).

### C. Permanent Injunctions.

Courts may grant injunctive relief upon a showing that "(1) the plaintiff has succeeded on the merits; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favor[] the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief." *Centech Grp.*, 554 F.3d at 1037 (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004)). While injunctive relief "is based on [the] four-factor test, a plaintiff's failure to achieve success on the merits is dispositive." *Kingfisher Sys., Inc. v. United States*, 145 Fed. Cl. 22, 34 (2019) (citing *PGBA*, 389 F.3d at 1228–29; *Career Training Concepts, Inc. v. United States*, 83 Fed. Cl. 215, 219 (2008)).

## IV. DISCUSSION

### A. The Navy's Failure to Disclose Its Departmental-Wide Requirement for Exclusive, Mandatory Use of ESA II Violates CICA.

Minburn alleges that the Navy violated the Competition in Contracting Act ("CICA") by two related means. *See* ECF No. 42 at 18–24. First, the Navy failed to disclose its actual requirement that ESA II would serve as an exclusive vehicle for all DoW purchases of Microsoft products and services. *Id.* at 18–19. Next, Minburn claims that DoW's undisclosed policy reflects a cardinal change which undermines fair competition. *Id.* at 19. The Navy argues that DFARS and language found in the Solicitation informed Minburn of ESA II's mandatory nature. ECF No. 46 at 14–16. Moreover, Minburn did not identify a material change to ESA II and knew of its increased scope. *Id.* at 17–19. Dell Federal adds that Minburn failed to show that the Navy acted beyond its "sweeping scope" as provided by the Solicitation as well. ECF No. 48-1 at 14.

CICA provides that agencies must "specify its needs and solicit bids or proposals in a manner designed to achieve full and open competition for procurement." 41 U.S.C. § 3306(a)(1)(A). The statute also requires the government to "develop specifications in the manner necessary to obtain full and open competition with due regard to the nature of the property or services to be acquired." 41 U.S.C. § 3306(a)(1)(C). Aligned with these principles, FSS BPAs must include "[s]ufficient detail about the need, such as scope of work." 48 C.F.R. § 538.7104-1(a)(1). However, CICA "does not prevent every modification of a contract by requiring a new bid procedure for every change." *AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993). Instead, only modifications falling outside "the scope of the original competed contract" thwarts competition. *Id.*

Under the cardinal change doctrine, courts answer "whether modifications to a government contract were severe enough to constitute a breach of contract by the government." *Golden Mfg. Co. v. United States*, 107 Fed. Cl. 264, 274 (2012) (citing *Allied Materials & Equip. Co. v. United States*, 569 F.2d 562, 563–64 (Ct. Cl. 1978)). Such changes occur when an agency "effects an alternation in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for." *Id.* (citation omitted). This Circuit recognizes the cardinal change doctrine in bid protests as well. *Id.* (citing *AT&T Commc'ns*, 1 F.3d at 1205). Courts consider in that context "whether Government modifications changed the contract enough to circumvent the statutory requirement of competition." *AT&T Commc'ns*, 1 F.3d at 1205. Making this determination turns on "the scope of the entire original procurement in comparison to the scope of the contract as modified." *Id.*

"Because every situation in which parties enter into a contractual relationship is unique, there is no definitive test for determining whether a change is beyond the scope of a particular contract." *Ian, Evan & Alexander Corp. v. United States*, 136 Fed. Cl. 390, 416 (2018) (quoting *Keeter Trading Co. v. United States*, 79 Fed. Cl. 243, 260 (2007)). Courts consider the "changes in the type of work, performance period, and" cost difference between the original and modified contracts. *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 792 (1997) (citation omitted). Another "important factor in determining the scope of the original competition" includes if the solicitation "adequately advised offerors of the potential" types of changes that could occur. *AT&T Commc'ns*, 1 F.3d at 1207. Courts should also evaluate "whether the modification is of a nature which potential offerors would reasonably have anticipated." *Id.* "Thus, a broad original competition may validate a broader range of later modifications without further bid procedures." *Id.*

Minburn's protest does not challenge the substantive aspects of ESA II, but how DoW Components may purchase their products and services. *See* ECF No. 42 at 21–22 (citing AR Tab 11 at 560). The Navy and Dell Federal interpret Minburn's alleged "status quo" as what occurred before ESA II. *See* ECF No. 46 at 17; ECF No. 48-1 at 17–18. There, DoW instructed its Components to use ESA I for on-premises licenses and DEOS for cloud-based licenses. *See* AR Tab 34 at 1948, Tab 39 at 2192. Acting together, both contract vehicles satisfied DoW's enterprise requirements. AR Tab 39 at 2192. The Court agrees that DoW's 2021 memorandum, which created this dynamic, did not grant department Components with unbridled discretion. Rather, it directed Components to place orders under specific vehicles with certain exceptions. *See id.* Nonetheless, Minburn "challenges DoW's *mandate of exclusive use*" that the Navy otherwise failed to disclose. ECF No. 54 at 8 (emphasis in original).

At the outset, the Solicitation lacks a clear and unambiguous statement of the Navy's policy for exclusive use. Nowhere does the Navy state in plain English that ESA II mandates exclusive participation with no exceptions. When addressing Minburn's claim, the parties selected language from different materials to support their theories. These statements contradict each other at times and include imprecise wording. In this case, a review of these materials is necessary before proceeding to Minburn's two theories of relief.

To start, ESA II describes itself as a "comprehensive" BPA that "will enable customers across the DoW to procure Microsoft software licenses." AR Tab 11 at 573. Licenses under ESA II would "include all Microsoft software used on all DoD networks." *Id.* at 549. As contemplated

by the Scope of Use provision, government entities "*may* transition into the Agreement at any time following the *expiration of their own Agreement*." *Id.* (emphasis added). The Solicitation also recognizes in a BPA Transition section a scenario in which DEOS customers would "decide" to transition to ESA II. *See id.* at 559–60. In that situation, "the Contractor shall ensure the transition is made with no penalty to the government." *Id.* at 560. The Solicitation further dictates that DoW's "ESI goals can only be realized if the Government and the Contractor direct *appropriate* sales through this BPA." *Id.* (emphasis added). To prevent "sales leakage," the contractor must "enforce the policy that this BPA is mandatory for consideration in accordance with DFARS Subpart 208.74 for the products within it." *Id.*

Under DFARS, agencies shall "fulfill requirements for commercial software and commercial software services" through the ESI Initiative. 48 C.F.R. § 208.7402(a). "ESI promotes the use" of ESAs to "allow DoD to obtain favorable terms and pricing for commercial software and commercial software services." *Id.* Acquisition procedures further dictate that agencies should determine if their ordering needs are within the DoD's inventory. DFARS Procedures, Guidance, and Information ("PGI") 208.7403(1). If not, officials must check if "the commercial software or related services are on an ESA." DFARS PGI 208.7403(3). Contracting officials must then determine if products and services under an ESA offer the best value to the government. *Id.* "If existing ESAs do not represent the best value to the Government," then a software product manager "shall be given an opportunity to provide the same or a better value to the Government under the ESAs before the contracting officer . . . may continue with alternate acquisition methods." DFARS PGI 208.7403(5). DFARS further allows contracting officers to purchase from other contracting vehicles if a product does not appear in DoD's inventory or an ESA. DFARS PGI 208.7403(2).

In its December 2025 memorandum, which was not available to the public or offerors, DoW ordered its components to "align their current and future Microsoft agreements to the greatest extent practicable" to the forthcoming ESA II. AR Tab 39 at 2225. DoW also wrote that all Components "are expected to procure Microsoft products exclusively through the ESI-provided catalog." *Id.* In its catalog, DoW represented that on June 1, 2026, "the Department has officially transitioned to a centralized acquisition approach. All DoW Components *are now* required to procure Microsoft products and services *exclusively*" through ESA II. AR Tab 34 at 1948. And "[w]hen an Enterprise Software Initiative [] is in place, this is a mandatory source of supply for the DoW." *Id.* at 1947.

After careful consideration, the Court finds that DoW's 2025 Memorandum and ESA II Ordering Guide do not constitute cardinal changes. Many cases raising the doctrine addressed formal modifications regarding the nature of the work to be performed. *See AT&T Commc'ns*, 1 F.3d at 1204 (entering into bilateral modification by adding new type of dedicated transmission service); *Golden Mfg.*, 107 Fed. Cl. at 276 (analyzing whether Amendment 15 to procurement qualified as a cardinal change); *Am. Apparel, Inc. v. United States*, 108 Fed. Cl. 11, 34 (2012) (concerning additional products added to solicitation); *IgniteAction JV, LLC v. United States*, 174 Fed. Cl. 62, 66 (2024); *Celerapro, LLC v. United States*, 168 Fed. Cl. 408, 433 (2023); *CCL, Inc*, 39 Fed. Cl. at 792.[10] Those situations do not include which customers could potentially place

[10] Dell Federal and the Navy claim that no differences exist between the Solicitation and award. ECF No. 46 at 15–16; ECF No. 48-1 at 18 ("No change (much less a substantial change) has occurred."). Indeed,

orders under a contract vehicle. As another court commented, "if the function or nature of work, as changed, remains generally the same, the change or changes will be held to fall within the general scope of the contract." *Green Mgm't Corp. v. United States*, 42 Fed. Cl. 411, 430 (1998). As a comprehensive BPA for Microsoft products and services, the scope of ESA II did not change to effect a cardinal change. The Court also doubts whether DoW's 2025 Memorandum and ESA II Ordering Guide qualify as modifications to a contract either. But whether the Navy's non-disclosure of its exclusive-use policy obstructed fair competition leads to a different finding.

DoW's policy pushes a department-wide directive to consolidate acquisition of Microsoft products and services through ESA II. AR Tab 34 at 1948, Tab 39 at 2225. Minburn did not become aware of this policy until after its customers mentioned the 2025 Memorandum and after the Navy awarded Dell Federal the BPA. Oral Arg. Tr. at 10:18–21. The Navy memorialized its policy in the ESA Ordering Guide which later became incorporated into the agreement. *See* AR Tab 11 at 551, Tab 34 at 1948. In other words, DoW developed its policy months before it issued the Solicitation but failed to inform offerors of its intentions during the procurement. Only after it awarded Dell Federal ESA II did DoW announce its policy. This book-end effect of a central premise of ESA II does not comport with CICA's mandate of transparency in competition.

Minburn perceives mandatory use as 100 percent exclusivity. On the other hand, Dell Federal and the Navy seem to interpret mandatory as requiring DoW Components to start with ESA II before looking to make purchases through other contract vehicles. ECF No. 46 at 13; ECF No. 56 at 5. Minburn points out a disconnect between DoW's policy and certain representations made to the Court. *See* Oral Arg. Tr. at 17:1–5. Both Dell Federal and the Navy equivocate that ESA II does not require absolute exclusivity under DFARS provisions incorporated into the Solicitation. ECF No. 46 at 13; ECF No. 56 at 5; Oral Arg. Tr. at 39:25–40:9; 64:1–15. Indeed, Dell Federal conceded that if "Minburn's got a better price and products . . . the Government can go buy it [through DEOS]." Oral Arg. Tr. at 64:24–65:2. Minburn characterizes this approach as a "new litigation position," that does not reflect DoW's true intent. ECF No. 54 at 11–12. And since the Navy and Dell Federal admit this point, they conceded Count I of its complaint. *See* ECF No. 54 at 9; Oral Arg. Tr. at 21:14–24.

At this point, the Court finds DoW's express policy found in the 2025 Memorandum and Ordering Guide more authoritative. Dell Federal and the Navy acknowledge that DFARS does not require Components to purchase exclusively from ESA II but nonetheless conclude otherwise. Both parties also assert that the Solicitation and related materials reflected DoW's policy for exclusive use. The record says otherwise.

For instance, the Solicitation contemplates situations in which DoW Components may have outstanding orders and agreements that overlap with ESA II's performance period. Under ESA II's scope, government entities *may* transition to the BPA following "the expiration of *their own Agreement*." AR Tab 11 at 549 (emphasis added). The Solicitation also required Microsoft and the contractor to cover costs should a DEOS customer *decide* to transition its Enterprise Products

---

none of the products and services offered by ESA II differ from the Solicitation. *Compare* AR Tab 11b at 580; *with* AR Tab 31a at 1681. Nor did the estimated quantity of products or type of agreement change. ECF No. 46 at 16. And the estimated value of ESA II did not change between the Solicitation and award. *Compare* AR Tab 11 at 541; *with* AR Tab 31 at 1652.

to ESA II. *Id.* at 560. Those statements contradict DoW's undisclosed policy for Components to exclusively purchase products and services from the ESI catalog. AR Tab 34 at 1948, Tab 39 at 2225. The permissive language of the Solicitation acknowledges that Components retain some power to move between contract vehicles. If Components lost their ability to decide whether to transition from other agreements or vehicles to ESA II, that language would become inoperative. *United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997) (construing contract to avoid surplusage of certain provisions). This discrepancy also begs another question: who makes the ordering decisions?

All parties agree that DFARS 208.74 applies to ESA II. DFARS 208.7402 imposes mandatory language for agencies to fulfill their software requirements through the ESI. DFARS 208.7402(a).[11] While acquisition procedures favor use of ESAs over other vehicles, DFARS provides carveouts for officials to purchase through other means. *See* DFARS PGI 208.7403(2), (5). Those include: (1) if DoD's inventory and ESAs do not contain the required services; or (2) if an ESA does not represent the best value to the government after a product manager attempts to match or provide a better value. *Id.* Two observations become apparent. First, contracting officers at the Component level—not DoW—determine whether an ESA represents the best value to the government. Second, best value does not equate to a lower price. FAR provides a litany of considerations in addition to price that ordering activities may consider. *See* FAR 8.405-1(f)(1)–(8). By enforcing an exclusive-use policy, DoW made a unilateral decision and a best value determination decision on behalf of its Components. *See* AR Tab 29 at 1646. However, each Component has individual needs and requirements that must be determined at the customer level. *See, e.g.*, ECF No. 42 at 38–39 (citing reasons why DEOS serves as a superior contract vehicle to ESA II). The ESA II BPA holder may match or provide better value to the government under DFARS PGI 208.7403(5). But DoW cannot pre-determine best value nor can the Navy justify this framework as mandating exclusive use of ESA agreements. Therefore, DoW's policy contradicts DFARS.

When asked where the Solicitation mandated exclusive use, the Navy cited the Solicitation's sales leakage provision. Oral Arg. Tr. at 34:1–3. The Court questions why a central requirement toward ESA II would be couched in a non-integral provision that did not expressly adopt DoW's policy. Regardless, a reading of the clause does not impose mandatory, categorical participation. Instead, the contractor—not DoW—must "enforce the policy that this BPA is mandatory for *consideration*" in accordance with DFARS. AR Tab 11 at 560 (emphasis added). The provision also contemplates appropriate sales under ESA II, not all sales of Microsoft products and services. *See id.* Appropriate sales under ESA II include products and services that present the best value to the government. *See generally* DFARS PGI 208.7403. That determination again occurs at the Component level, not through a department-wide policy. Under its plain meaning, "mandatory for consideration" does not equate to mandatory exclusive use. *See* Oral Arg. Tr. at 41:23–42:2 (confirming that Components must look at ESA II but are not compelled to order from

---

[11] ESI *promotes*, not mandates, that government Components use ESA agreements too. DFARS 208.7402(a). When read in full, the language of DFARS 208.7402(a) appears to acknowledge that ESA agreements may not always present the best value to the government. Thus, DFARS stops short of providing for exclusive use of ESA agreements when fulfilling software purchases.

it); ECF No. 54 at 10. Thus, ESA II's sales leakage provision does not advance DoW's policy of exclusive use.

Dell Federal and the Navy further contest that ESA II's comprehensive scope should have warned Minburn of its exclusive nature. ECF No. 46 at 17–18; ECF No. 48-1 at 14–16. "Specifically, the RFQ should have alerted Minburn that the classified, cloud-based services were being included on the DoW ESA II contract instead of DEOS." ECF No. 46 at 18; Oral Arg. Tr. at 40:24–25 ("The actual change is the list of products and the types of products that this contract covers."). Both defendants mistake comprehensive coverage for exclusive use. Although ESA II appears to subsume DEOS's capabilities, contracting officers must still make best value determinations. Those procurement decisions include choosing between different contract vehicles. *See also* ECF No. 54 at 11 (noting that ESA I, DEOS, and other ESI vehicles overlapped in scope). The Court agrees that the government may induce agencies and components to purchase their products and services through specific means. But contractors should not be left in the dark on major premises surrounding a procurement agreement. BPAs like ESA II and DEOS do not qualify as contracts due to lack of mutual consideration. *See McLeod Grp., LLC v. United States*, 840 Fed. App'x 525 (Fed. Cir. 2020). As Dell Federal explains, these vehicles do not guarantee or obligate purchases moving forward. *See* ECF No. 56 at 4. However, DoW's policy in substance would turn ESA II into a requirements contract by mandating exclusive use of its catalog for Microsoft products and services. ECF No. 54 at 8 n. 5. In the interest of fairness and competition, omitting this information from offerors during procurement violates CICA.

Dell Federal cautions that this Court should not "be in the business of micromanaging" BPA Ordering Guides and internal policy memorandums. Oral Arg. Tr. at 71:19–21. However, examination of such materials becomes necessary when agencies fail to apprise contractors of key requirements that alter the competitive landscape of an agreement. In a vacuum, DoW's policy for mandatory, exclusive use under ESA II does not present any problems. DoW and the Navy may implement acquisition strategies as they see fit. That does not excuse their obligations to specify their needs and oversee procurement in a manner that supports open competition. *See* 41 U.S.C. § 3306(a)(1)(A). Government agencies need not "document every decision it makes in rigorous detail" in FAR subpart 8.4 procurements either. *See Integrates Fin. & Acct. Sols., LLC v. United States*, 161 Fed. Cl. 475, 496 (2022) (citation omitted). Yet omissions of material information that influence an offeror's risk profile and bidding assumptions require more than piecemeal citations and *post-hoc* explanations for a department's undisclosed exclusive-use policy. Today, the Navy and DoW fell short of CICA's standards.

The Navy's violation of CICA now requires the Court to examine whether its error prejudiced Minburn's proposal. As a reminder, Minburn must demonstrate that "there was a substantial chance it would have received the contract but for" the Navy's error. *Bannum*, 404 F.3d at 1358 (citations and quotations omitted). This Circuit has "held that *de minimis* errors do not require the overturning of an award." *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (emphasis in original). De minimis errors include those "that are so insignificant when considered against the solicitation as a whole that they can be safely ignored and the main purposes of the contemplated contract will not be affected if they are." *Id.*

Minburn asserts that "DoW's actions fundamentally changed this procurement in a manner that [it] reasonably could not have anticipated." ECF No. 42 at 22. Had ESA II reflected DoW's undisclosed policy, "this information would have greatly impacted Minburn's competitive strategy in connection with the" procurement. *Id.* (citing [redacted] Decl. at ¶ 33). And if it became aware of DoW's policy beforehand, Minburn would have filed "aggressive pre-award challenges against such a mandate," and taken on "significantly more pricing risk" in its proposal. *Id.* at 23. In response, Dell Federal contends that Minburn failed to demonstrate "what prices it would have lowered or offered a rational reason why Minburn would have lowered its prices." ECF No. 48-1 at 20. By Dell Federal's account, Minburn's prejudice arose from its failure to consider "the RFQ's instruction for Minburn to submit its best response and pricing." *Id.* at 21 (citing AR Tab 11 at 574).

Indeed, offerors were "strongly encouraged" to provide their best figures to the Navy. AR Tab 11 at 574. But the Navy's failure to disclose its actual requirements deprived Minburn of the opportunity to "compete intelligently" for award. ECF No. 54 at 16. Without knowledge of a central premise to the procurement, Minburn submitted its proposal devoid of important considerations that impacted its procurement strategy. Departments and agencies are obligated to conduct acquisitions in an open and transparent fashion. When they fail to meet this standard under CICA, contractors like Minburn suffer non-trivial prejudice that warrants relief.

Therefore, the Court finds that the Navy's failure to disclose DoW's policy to use ESA II as the exclusive contract vehicle for Microsoft products and services prejudiced Minburn.

**B. The Court's Finding Regarding the Navy's CICA Violation Obviates the Need to Address Minburn's Unbalanced Pricing Claim.**

Next, Minburn alleges that the Navy failed to perform an unbalanced pricing analysis. ECF No. 42 at 32. According to Minburn, Dell Federal proposed an "anomalous discount" to a single CLIN that represents the difference between both contractor's proposals. *Id.* By proposing a steep discount on that item, the Navy failed to "identify this overt evidence" and "evaluate the risks associated with it." *Id.* By contrast, the Navy and Dell Federal contend that systemic changes to FAR removed the Navy's obligation to perform an unbalanced pricing analysis. ECF No. 46 at 34–37; ECF No. 48-1 at 38–40. And even if FAR required the Navy to perform such an analysis, it satisfied the requirement. ECF No. 46 at 38–39; ECF No. 48-1 at 40–43.

Unbalanced pricing occurs when "despite an acceptable total evaluated price, the price of one or more line items is significantly over or understated as indicated by the application of cost or price analysis techniques." 48 C.F.R. § 15.505-1(g)(1). Stated differently, a "material imbalance occurs if an award fails to represent the lowest ultimate cost to the Government or the imbalance is such that it will adversely affect the integrity of the bidding system." *Green Tech. Grp., LLC v. United States*, 147 Fed. Cl. 231, 240 (2020) (quoting *SMS Data Prods. Grp., Inc. v. United States*, 900 F.2d 1553, 1557 (Fed. Cir. 1990)). Offers with "separately priced line items . . . shall" be analyzed to determine if unbalanced pricing exists. 48 C.F.R. § 15.505-1(g)(2). If cost or pricing techniques reveal unbalanced prices, contracting officers must complete a two-step process. *Id.* First, a contracting officer must consider the risks "associated with the unbalanced pricing in determining the competitive range and in making the source selection decision." 48

C.F.R. § 15.404-1(g)(2)(i). And then, an agency must consider whether the award "will result in paying unreasonably high prices for contract performance." 48 C.F.R. § 15.404-1(g)(2)(ii).

In such situations, "a significant disparity in only one CLIN price may justify the rejection of a proposal as unbalanced." *Al Ghanim Combined Grp. Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed. Cl. 502, 516 n. 17 (2003). Yet, there "is no bright-line test to evaluate when an overstated or understated line-item price" poses a risk for unsuccessful performance or unreasonably high price. *Green Tech.*, 147 Fed. Cl. at 240.

Minburn conceded that finding a CICA violation would moot its unbalanced pricing claim. Oral Arg. Tr. at 22:24–25:4. Because the Court holds that the Navy violated CICA, which warrants reissuing the Solicitation, the Court declines to address this issue further.

**C. The Other Factors of a Permanent Injunction Warrant Relief.**

Although Minburn succeeded on Count I of its complaint, the inquiry does not stop here. The company must still show that it will "suffer irreparable harm . . ., the balance of the hardships favors an injunction, and" the public interest weighs in favor such relief. *RLB Contracting, Inc. v. United States*, 118 Fed. Cl. 750, 760 (2014), *aff'd*, 621 F. App'x 1026 (Fed. Cir. 2015) (citing *PGBA*, 389 F.3d at 1228–29. Upon review, Minburn makes a requisite showing for injunctive relief.

When assessing irreparable harm, "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction." *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 494 (2013) (quoting *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 743 (2000)). Courts recognize that a lost opportunity to compete in a fair competition suffices for irreparable harm. *Seventh Dimension, LLC v. United States*, 160 Fed. Cl. 1, 34 (2022) (collecting cases and noting that this "concept stretches back more than two decades."); *BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502, 514 (2013) ("[The] denial of a fair opportunity to compete and loss of financial benefit from a lawful procurement process constitute irreparable harm."). Minburn posits that absent injunctive relief, it "will lose the opportunity to compete for and perform *billions* of dollars in orders for Microsoft products." ECF No. 42 at 37 (emphasis in original). In addition, it will lose "continuity of mission support, customer confidence, and aspects of its specialized classified-market position that cannot be fully restored at a later date." *Id.* (citing [redacted] Decl. at ¶ 48).

On that point, the Navy and Dell Federal attribute Minburn's purported harm to DEOS, a separate contract vehicle. ECF No. 46 at 40–41; ECF No. 48-1 at 49. Since DEOS, a BPA, does not guarantee performance, Minburn cannot suffer irreparable harm. ECF No. 46 at 41 (citing *Kennedy Collective v. United States*, 174 Fed. Cl. 545, 555 (2025). The Federal Circuit has recognized threats to business operations as capable of establishing irreparable harm. *See Natera, Inc. v. NeoGenomics Lab'ys, Inc.*, 106 F.4th 1369, 1379 (Fed. Cir. 2024) (affirming district court's irreparable harm conclusion to include lost "potential customers, profits, business relationships, and clinical opportunities."). But irreparable harm in bid protests must flow from the procurement at issue, not collateral sources. Nonetheless, the Navy's failure to disclose its exclusive-use policy during the procurement violated CICA. That omission diminished Minburn's ability to compete

fairly for a contract vehicle covering products and services it offers. *See* ECF No. 42 at 37. Therefore, the Court finds that absent an injunction Minburn will suffer irreparable harm.

Next, "the court must weigh the irreparable harm" Minburn "would suffer without an injunction against the harm an injunction would inflict on" the Navy. *Progressive Indus., Inc. v. United States*, 129 Fed. Cl. 457, 485. Minburn claims that the Navy would suffer no harm should the Court enter an injunction. ECF No. 42 at 38–39. According to Minburn, DEOS may cover DoW's needs for classified orders and provides flexibility that ESA II does not have. *Id.* Minburn further suggests that DoW could resort to temporary acquisition strategies to obtain unclassified orders to accommodate any delays in reissuing the Solicitation. *Id.* at 39. The Navy counters that DoW customers will face substantial harm. ECF No. 46 at 41. Those harms include increased costs of using DEOS as opposed to ESA II. *Id.* Using different contracting vehicles would also undermine acquisition strategy and could leave customers without additional funding to cover additional costs. *Id.* The Court acknowledges that the Navy forecasted significant cost savings to ESA II. *See generally* AR Tab 29. But its prospective harm arises in-part due to its failure to abide by CICA. *Anham FZCO v. United States*, 144 Fed. Cl. 697, 724 (2019). These "additional procurement delays and costs pose less of a hardship" to the Navy than harm faced by Minburn. *SAGAM Securite Senegal v. United States*, 154 Fed. Cl. 653, 673 (2021), *aff'd*, No. 2021-2279, 2023 WL 6632915 (Fed. Cir. Oct. 12, 2023). Thus, the balance of hardships weighs in favor of Minburn.

Finally, "[i]t is axiomatic that the public has an interest in honest, open, and fair competition in the procurement process." *Glob. Dynamics, LLC v. United States*, 138 Fed. Cl. 207, 210 (2018); *see also Metcalf Constr. Co. v. United States*, 53 Fed. Cl. 617, 645 (2022) (defining twin goals of public interest as preserving "public confidence and competition in the federal procurement process."). Here, the public maintains an interest in ensuring that the government oversees procurement competitions with clarity and transparency.

Because the Court finds granting Minburn an injunction appropriate, it must determine the scope of relief. The Navy proposed that the Court "grant a narrowly tailored injunction." ECF No. 46 at 42; ECF No. 55 at 20. In particular, the Navy requests that "any injunction enjoin only the classified IL6/IL7 orders, which is in line with the harm Minburn alleges." ECF No. 55 at 20. Minburn believes that any relief depends on how the Court defines DoW's "actual requirement" under ESA II. *See* Oral Arg. Tr. at 19:24–25 ("So one way or the other, we need some kind of relief from the Court."). If the Court found that DoW intended to enforce a 100 percent, exclusive-use policy, then Minburn requests that the Navy "resolicit the requirement and let Minburn compete for the actual requirement." *Id.* at 19:4–9. But if the Court accepted the Navy and Dell Federal's position in their briefs, it seeks injunctive relief to invalidate the 2025 internal memorandum and language found in the ESA II Ordering Guide. *Id.* at 19:18–23. "Flexibility rather than rigidity has distinguished injunctive relief making it the instrument for nice adjustment and reconciliation between the public interest and private needs." *Serco, Inc. v. United States*, 101 Fed. Cl. 717, 721 (2011) (citation and quotations omitted). The Court finds that the Navy's violation of CICA requires the agency to reissue the Solicitation and allow offerors to recompete for award.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Minburn's motion for judgment on the administrative record, ECF No. 42, and **DENIES** the Navy and Dell Federal's motion for judgment on the administrative record, ECF Nos. 46, 48. The Court will hold a telephonic status conference on **September 28, 2026, at 3:00 p.m. ET**, to discuss the exact scope of injunctive relief. The parties are ordered to file a joint status report on or before **October 9, 2026**, that proposes redactions to this Opinion to allow the Court to file a public version of this Opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge